IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-08-00288-CR

 

Ronald Troy Caldwell,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 



From the 18th District Court

Johnson County, Texas

Trial Court No. F41828

 



MEMORANDUM  Opinion










 

            Ronald Troy Caldwell was found guilty
by a jury of the offense of Unauthorized Use of a Motor Vehicle.  Tex. Pen. Code Ann. § 31.07 (Vernon
2003).  After pleading true to three enhancement paragraphs, the jury sentenced
 Caldwell to imprisonment for twenty (20) years in the Texas Department of
Criminal Justice – Institutional Division and a $10,000.00 fine.  Tex. Pen. Code Ann. § 12.42(a)(2)
(Vernon 2003).  Caldwell complains that the evidence was insufficient to
sustain a conviction and that the trial court erred in denying his request for
a mistrial.  Because we find the evidence is legally and factually sufficient
and the trial court did not abuse its discretion in denying Caldwell’s request
for a mistrial, we affirm.

Legal and Factual Sufficiency

In reviewing the legal sufficiency of the
evidence, this Court looks at all of the evidence in the light most favorable
to the verdict to determine whether any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt.  Jackson v.
 Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); Bigon
v. State, 252 S.W.3d 360, 366 (Tex. Crim. App. 2008).  "[C]ourts
reviewing all the evidence in a light favorable to the verdict must assume
jurors made all inferences in favor of their verdict if reasonable minds could,
and disregard all other inferences in their legal sufficiency review."  Evans
v. State, 202 S.W.3d 158, 165 n.27 (Tex. Crim. App. 2006) (quoting City
of Keller v. Wilson, 168 S.W.3d 802, 821 (Tex. 2005)); accord Watson v.
State, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006). 

Under a legal sufficiency review, we consider all
of the evidence admitted, both properly and improperly admitted, as well as
direct and circumstantial evidence.  Conner v. State, 67 S.W.3d 192, 197
(Tex. Crim. App. 2001).  The jury, as sole judge of the witnesses' credibility
and the weight to be given their testimony, is free to accept or reject any or
all of the evidence presented by either side. See Margraves v. State, 34
S.W.3d 912, 919 (Tex. Crim. App. 2000).  The reviewing court must give
deference to "the responsibility of the trier of fact to fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts."  Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443
 U.S. at 318-19).  Circumstantial evidence is as probative as direct evidence
in establishing the guilt of an actor and can alone be sufficient to establish
guilt. Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

In a factual-sufficiency review, there is only one
question to be answered: “Considering all of the evidence in a neutral light,
was a jury rationally justified in finding guilt beyond a reasonable doubt?”  Grotti
v. State, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008); Watson, 204
S.W. 3d at 415.  Evidence can be factually insufficient in one of two ways: (1)
when the evidence supporting the verdict is so weak that the verdict seems
clearly wrong and manifestly unjust; and (2) when the supporting evidence is
outweighed by the great weight and preponderance of the contrary evidence so as
to render the verdict clearly wrong and manifestly unjust.  Roberts v. State,
220 S.W.3d 521, 524 (Tex. Crim. App. 2007) (citing Watson, 204 S.W.3d
404, 414-15 (Tex. Crim. App. 2006); Johnson v. State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000); see also Castillo v. State, 221 S.W.3d 689, 693
(Tex. Crim. App. 2007).  "[A]n appellate court must first be able to say,
with some objective basis in the record, that the great weight and
preponderance of the . . . evidence contradicts the jury's verdict before it is
justified in exercising its appellate fact jurisdiction to order a new
trial."  Watson, 204 S.W.3d at 417.  A
reversal for factual insufficiency cannot occur when "the greater weight
and preponderance of the evidence actually favors conviction."  Roberts,
220 S.W.3d at 524.  

Although an appellate court has the ability to
second-guess the jury to a limited degree, the factual-sufficiency review
should still be deferential, with a high level of skepticism about the jury's
verdict required before a reversal can occur.  Grotti v. State, 273
S.W.3d 273, 283 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 417.  An
appellate court judge cannot conclude that a conviction is "clearly
wrong" or "manifestly unjust" simply because, on the quantum of
evidence admitted, he would have voted to acquit had he been on the jury.  Watson,
204 S.W.3d at 714.  Nor can an appellate court judge declare that a conflict in
the evidence justifies a new trial simply because he disagrees with the jury's
resolution of that conflict.  Id.  The verdict may be set aside
only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust.  Grotti, 273 S.W.3d at 280.

Caldwell
contends that the evidence was insufficient for the jury to find beyond a
reasonable doubt that he operated the motor vehicle at any time.  The testimony
was that a dark green Cavalier was stolen from a residence approximately one
mile from Caldwell’s home near Burleson, Texas.  Caldwell had been dropped off
by his sister at his home at or before 9:00 a.m. that morning.  Caldwell called his sister from Alvarado shortly thereafter, and it was impossible to walk
or ride a bicycle from his home to Alvarado in that amount of time.  Caldwell did not own a vehicle.

An employee of the Sonic restaurant observed the
Cavalier parked in the back of the parking lot as early as 8:40 a.m. when one
of them delivered a drink to him.  Another employee observed Caldwell in the
stolen vehicle looking through binoculars toward a bank next door to the Sonic
at approximately 10:20 a.m.  The first employee verified that this was the same
individual and vehicle.  They called the police regarding a suspicious
vehicle.  The employee observed the vehicle drive away prior to the police
arriving at the Sonic, and it returned at some point although the employee did
not see it return.  

After the police arrived, an officer saw an
individual she later identified as Caldwell sitting alone in the driver’s seat
of the Cavalier.  In court, one of the employees and the officer identified
Caldwell as the individual they saw sitting in the driver’s seat of the stolen
car.  The officer saw Caldwell turn the headlights on and off, exit the
vehicle, and walk to the rear of the Sonic where she lost visual contact with
him.  There was only one person in the vehicle that the officer observed.  The
officer went to the back of the Sonic and saw that the door to the restroom was
closed.  She then went inside the Sonic to make contact with the two employees,
and she confirmed that the description of the individual in the vehicle matched
the description of the person she had observed in the vehicle.  The officer
returned to the restroom and waited until Caldwell came out.  Caldwell started
to quickly walk toward the field behind the Sonic but returned when the officer
called him.  After verifying his identity and that he had no warrants, Caldwell was allowed to leave.  He then went into the Sonic and apologized to the
employees for causing a scene before he left on foot.

That day, Caldwell told an acquaintance who gave
him a ride home from Alvarado that he had borrowed a car, parked it at the
Sonic, and walked to a field behind the Sonic to spy on his ex-girlfriend with
his binoculars.  His ex-girlfriend’s residence was in view of the Sonic.  Caldwell told this acquaintance that he had left his binoculars in the vehicle and walked
away from the vehicle when the police arrived.

Caldwell had
often come to Alvarado to meet with his ex-girlfriend at various locations.  Caldwell’s ex-girlfriend lived with her daughter in Alvarado.  Meetings at his
ex-girlfriend’s residence had to take place when her daughter was not at home,
because her daughter had forbidden Caldwell to come to her home. 

The day this transpired was a rainy day and the
interior of the car was muddy, which potentially could have come from the field
adjacent to the Sonic.  The officer found a pair of binoculars and a cold,
partially empty drink cup from Sonic when she inventoried the vehicle.

Caldwell
contends that the evidence was insufficient because no one saw him drive or
operate the vehicle.  Further, Caldwell contends that the evidence is
insufficient because he does not fit the description of the individual
described by the Sonic employees, as he is not balding.  Caldwell avers that
the only evidence that he operated the vehicle came from the testimony of his
acquaintance, which he contends is questionable, although he does not explain
why.

There is no statutory definition of
"operate."  Barton v. State, 882 S.W.2d 456, 459 (Tex. App.—Dallas
1994, no pet.).  However, the Court of Criminal Appeals has held, to find
operation of a motor vehicle, "the totality of the circumstances must
demonstrate that the defendant took action to affect the functioning of his
vehicle in a manner that would enable the vehicle's use."  Denton v. State, 911 S.W.2d 388, 390 (Tex. Crim. App. 1995).  Under this
standard, “operating” a motor vehicle is interpreted very broadly.  Strong
v. State, 87 S.W.3d 206, 215 (Tex. App.—Dallas 2002, pet. ref'd).  Because
“operating” a motor vehicle is defined so broadly, any action that is more than
mere preparation toward operating the vehicle would necessarily be an
"action to affect the functioning of [a] vehicle in a manner that would
enable the vehicle's use.”  Id. at 216.  Juries are permitted to make
reasonable inferences from the evidence presented at trial and circumstantial
evidence is as probative as direct evidence in establishing the guilt of an
actor. Hooper v. State, 214 S.W.3d 9, 14-15 (Tex. Crim. App. 2007).
 From the circumstantial evidence, taken with the direct evidence, the
jury could reasonably infer that Caldwell operated the vehicle.

Reviewing the evidence under the appropriate
standards, giving deference to the jury as the determiner of facts and the
credibility of the witnesses, we find the evidence both legally and factually
sufficient to prove that Caldwell operated the motor vehicle.  We overrule
issue one.

Denial of Mistrial

Caldwell complains that the trial court abused its
discretion by denying his request for a mistrial after a police officer who was
a witness for the State testified that one of the Sonic employees had not made
a statement because of fear of reprisals in a non-responsive answer to a
question by the State.  Caldwell timely objected to the testimony and asked the
trial court to instruct the jury to disregard the testimony.  The trial court
sustained the objection and instructed the jury to disregard the statement. 
There was no further testimony regarding any specific reprisals to which the
officer was referring, and specifically no testimony regarding who was behind
the eyewitness’s fear of reprisals.  No further reference was made to this
statement throughout the rest of the trial, including closing arguments.

As with other matters in which abuse of discretion
is the issue, we will uphold the trial court's ruling if it was within the
“zone of reasonable disagreement.”  Wead v. State, 129 S.W.3d 126, 129
(Tex. Crim. App. 2004) (citing Montgomery v. State, 810 S.W.2d 372, 391
(Tex. Crim. App. 1990) (op. on reh'g)).  A witness's inadvertent reference to
an extraneous offense generally can be cured by a prompt instruction to
disregard.  Rojas v. State, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998). 
We presume that a jury will obey a trial court's instruction to disregard
evidence that has not been admitted.  Ladd v. State, 3 S.W.3d 547, 567
(Tex. Crim. App. 1999).  An exception exists when the reference to an
extraneous offense was clearly calculated to inflame the minds of the jury or
was of such damning character as to suggest it would be impossible to remove
the harmful impression from the jurors' minds.  Rojas, 986 S.W.2d at
250.

The officer’s statement here was not of a nature
calculated to inflame the jury, or of such damning character as to be
impossible to remove from the jurors' minds.  Rather, this statement was
adequately addressed by a sustained objection and an instruction to disregard. 
See Rojas, 986 S.W.2d at 250-51; Sperling v. State, 924
S.W.2d 722, 724-25 (Tex. App.—Amarillo 1996, pet. ref'd) (reference by State's
witness to defendant's prior incarceration during direct examination did not
require mistrial); Rudd v. State, 921 S.W.2d 370, 373-74 (Tex. App.—Texarkana
1996, pet. ref'd) (reference by State's expert witness to defendant's arrest at
age seven during direct examination did not require mistrial); Kirkland v.
State, 786 S.W.2d 557, 562 (Tex. App.—Austin 1990, no pet.) (reference by
police officer to defendant's failure to appear in court for traffic citations
during State's direct examination did not require mistrial).  In cases such as
this, we must assume that the jury properly heeded the instructions of the
trial court. See Ladd, 3 S.W.3d at 567.  

The officer's reference to an extraneous offense
was cured by Caldwell's objection and by the trial court's instruction to
disregard.  Caldwell has not demonstrated that the jury did not heed the
trial court’s instruction.  Therefore, the trial court did not abuse its
discretion in denying Caldwell's motion for mistrial.

Conclusion

            We find that the evidence is legally
and factually sufficient to support the conviction of Caldwell.  We find that
the trial court did not abuse its discretion in denying Caldwell’s motion for
mistrial.  We affirm the judgment of conviction.

 

                                                                        TOM
GRAY

                                                                        Chief
Justice

 

Before Chief Justice
Gray,

            Justice
Reyna, and

            Justice Davis

Affirmed

Opinion delivered and
filed November 4, 2009

Do not publish 

[CR25]






34.02 of the
Family Code of Texas in that the Defendant did not notify any law enforcement agency
nor the Texas Department of Human Resources.

The State filed an information on March 10, 1999 which contains similar allegations. Count one
of the information alleges that on or about November 15, 1996, Laura:
did then and there, having cause to believe that the physical or mental health or welfare
of a child, [C.W], had been or may be directly affected by abuse or neglect, knowingly
failed [sic] to report in accordance with section 261.103 of the Family Code of Texas in
that the Defendant did not notify any local or state law enforcement agency nor the Texas
Department of Protective and Regulatory Services.

The information contains four additional counts which allege that she committed similar offenses
on or about August 31, 1997, September 19, 1997, October 15, 1997, and February 13, 1998. 
      Laura filed a motion to quash the information alleging that it is defective because it fails to
specify “those acts that she failed to report” and thus does not “allege the specific acts which
constitute and give rise to the duty of this defendant to act.” She also filed a motion to dismiss
contending that section 261.109 of the Family Code is unconstitutionally vague as applied to her.


 
The court denied both motions.
      The alleged victim C.W. is the daughter of Laura’s former husband Eric from another
relationship.


 Laura and Eric married in June 1994. At the time, they both worked as officers
for the Fort Worth Police Department. They did not learn of C.W.’s existence until two years
later. As Laura and Eric began visiting C.W. in her maternal grandmother’s home, they noticed
bruising and other signs of abuse and neglect. Laura testified that she reported these observations
to the Child Protective Services Division of the Department of Protective and Regulatory Services
(“CPS”) on the advice of her attorney. According to Laura, CPS declined to investigate because
a custody suit was already pending and C.W. would soon be in the Whites’ home. C.W. came
to live with Laura and Eric in October 1996. The family court awarded them managing
conservatorship one month later.


 
      At trial, the State presented the testimony of witnesses who observed severe bruising on C.W.
on several occasions after she went to live with the Whites. These witnesses all testified that they
discussed their observations with Laura, who never reported them to CPS. A babysitter did report
her observations to CPS, which investigated but failed to substantiate the allegations. Laura and
Eric separated in May 1997. Several of the State’s witnesses testified that C.W. remained
primarily in Laura’s care after the separation. Laura testified, however, that C.W. remained in
Eric’s care after the separation. The sitter who had previously called CPS noticed severe bruising
on C.W. again on February 14, 1998 when she kept C.W. while Laura and Eric went to dinner.


 
She called the police. The responding officers observed bruising on C.W.’s thigh, buttocks, and
in both ears. They then went to Laura’s house to discuss their findings. 
      According to a CPS caseworker, the Whites denied any knowledge of these bruises. 
However, Laura did volunteer that she had caused a bruise on the front of C.W.’s thigh several
days earlier when she had spanked C.W. with a wooden paddle for lying about a bathroom
accident. She also told the caseworker privately that Eric might have caused the other bruises.
      Laura presented several witnesses to counter the State’s evidence. She denied that she had
seen any of the injuries testified to by the State’s witnesses or that anyone had called them to her
attention. Her witnesses testified that C.W. lived with Eric after Laura and he separated. They
stated that Laura was not with C.W. on the dates alleged in counts two through four of the
information. Another babysitter testified that Eric had full custody of C.W. after the separation
and that she regularly babysat C.W. between September and December of 1997. She never saw
Laura with C.W. during this time period. Laura likewise testified that she had little contact with
C.W. after the separation.
      The State presented the rebuttal testimony of one witness who stated that she had seen Laura
with C.W. at the home of the sitter who reported the suspected abuse at least once per week and
on three or four weekends between August and October of 1997.
MOTION TO QUASH
      Laura contends in her fifth point that the court erred by denying her motion to quash the
information because it does not provide adequate notice of the manner and means by which she
committed the offenses alleged. Each count alleges in pertinent part that, on the occasion in
question, Laura “did then and there, having cause to believe that the physical or mental health or
welfare of a child, [C.W.], had been or may be directly affected by abuse or neglect, knowingly
failed [sic] to report.” 
      According to Laura, this allegation does not suffice because it does not provide “specific
notice as to what type of abuse occurred to the child, how the abuse was alleged to [sic] occurred
to the child, or when the actual abuse occurred to the child, if any, and in who’s [sic] presence.” 
In her case, the State did not have to prove the latter three (i.e., how, when, or in whose presence
the abuse occurred). However, the State did have to show facts within Laura’s knowledge which
gave her cause to believe that C.W. had been “affected by abuse.”


 See Tex. Fam. Code Ann.
§ 261.109(a) (Vernon 1996).
      Section 261.001 defines the term “abuse” to include the following:
(A) mental or emotional injury to a child that results in an observable and material
impairment in the child's growth, development, or psychological functioning;
 
(B) causing or permitting the child to be in a situation in which the child sustains a mental
or emotional injury that results in an observable and material impairment in the child's
growth, development, or psychological functioning;
 
(C) physical injury that results in substantial harm to the child, or the genuine threat of
substantial harm from physical injury to the child, including an injury that is at variance
with the history or explanation given and excluding an accident or reasonable discipline
by a parent, guardian, or managing or possessory conservator that does not expose the
child to a substantial risk of harm;
 
(D) failure to make a reasonable effort to prevent an action by another person that results
in physical injury that results in substantial harm to the child;
 
(E) sexual conduct harmful to a child's mental, emotional, or physical welfare;

      (F) failure to make a reasonable effort to prevent sexual conduct harmful to a child;
 
(G) compelling or encouraging the child to engage in sexual conduct as defined by
Section 43.01, Penal Code;
 
(H) causing, permitting, encouraging, engaging in, or allowing the photographing,
filming, or depicting of the child if the person knew or should have known that the
resulting photograph, film, or depiction of the child is obscene as defined by Section
43.21, Penal Code, or pornographic;
 
(I) the current use by a person of a controlled substance as defined by Chapter 481,
Health and Safety Code, in a manner or to the extent that the use results in physical,
mental, or emotional injury to a child; or
 
(J) causing, expressly permitting, or encouraging a child to use a controlled substance as
defined by Chapter 481, Health and Safety Code.
       
Tex. Fam. Code Ann. § 261.001(1) (Vernon Supp. 2001).


 Therefore, the State had to establish
that Laura knew of facts which gave her cause to believe that C.W. had been directly affected by
one of the ten types of abuse listed above.
      “[W]hen a statute defines the manner or means of commission in several alternative ways, an
indictment will fail for lack of specificity if it neglects to identify which of the statutory means it
addresses.” State v. Mays, 967 S.W.2d 404, 407 (Tex. Crim. App. 1998). Therefore, “[i]n the
face of a motion to quash . . ., an information must provide more specific allegations if the ‘statute
identifies more than one method by which it can be violated.’” Tullous v. State, 23 S.W.3d 195,
196-97 (Tex. App.—Waco 2000, pet. ref’d) (quoting Smith v. State, 895 S.W.2d 449, 453 (Tex.
App.—Dallas 1995, pet. ref’d)).
      The Family Code provides ten different definitions for the term “abuse.” A person can be
prosecuted under section 261.109 if she has cause to believe that a child has been abused in any
of those ten distinct manners and fails to report it. Accordingly, the court should have required
the State to provide more specificity regarding the type(s) of abuse at issue in response to Laura’s
motion to quash. See id. Because the court erred by failing to do so, we must determine whether
this error requires reversal. See Saathoff v. State, 891 S.W.2d 264, 267 (Tex. Crim. App. 1994)
(citing Adams v. State, 707 S.W.2d 900 (Tex. Crim. App. 1986)); Flores v. State, 33 S.W.3d
907, 919 (Tex. App.—Houston [14th Dist.] 2000, no pet.).
      A complaint that an information does not provide adequate notice alleges a defect of form. 
See Olurebi v. State, 870 S.W.2d 58, 61 (Tex. Crim. App. 1994); Flores, 33 S.W.3d at 919; see
also Tex. Code Crim. Proc. Ann. arts. 21.02(7), 27.09(2) (Vernon 1989). We must not reverse
a judgment because of a defect in the form of an information unless this defect has “prejudice[d]
the substantial rights of the defendant.”


 Tex. Code Crim. Proc. Ann. art. 21.19 (Vernon
1989); see also Saathoff, 891 S.W.2d at 267; Adams, 707 S.W.2d at 902; Flores, 33 S.W.3d at
919. Adams provides the analysis we must follow to answer this question. “If sufficient notice
is given, this ends our inquiry. If not, the next step is to decide whether, in the context of the
case, this had an impact on the defendant's ability to prepare a defense, and, finally, how great
an impact.” Adams, 707 S.W.2d at 903; accord Flores, 33 S.W.3d at 919.
      We have already determined that the information did not provide sufficient notice to Laura
of the type of abuse at issue. Accordingly, we examine the entire record to determine whether this
had an impact on her ability to prepare a defense. See id. 
      Beginning with opening statements, the record reflects that the parties prosecuted and
defended this case under the assumption that C.W. had been physically abused on each of the
occasions in question. See Tex. Fam. Code Ann. § 261.001(1)(C). None of the other statutory
definitions for “abuse” were even arguably raised. Laura’s defense revolved around her position
that she did not have access to C.W. during the time period at issue and that she never saw any
of the bruises the State’s witnesses testified that they had called to her attention. She challenged
the credibility of the State’s witnesses alleging that they were biased against her.
      Because both parties clearly focused on a theory of physical abuse under section
261.001(1)(C), we conclude that the trial court’s failure to require more specificity in the
information had little or no impact on Laura’s ability to prepare her defense. See Flowers v. State,
890 S.W.2d 906, 913-14 (Tex. App.—El Paso 1994, no pet.); Olurebi v. State, 875 S.W.2d 807,
807-08 (Tex. App.—Houston [1st Dist.] 1994, pet. ref’d); Karnes v. State, 873 S.W.2d 92, 100
(Tex. App.—Dallas 1994, no pet.). Accordingly, we overrule Laura’s fifth point.
FACTUAL SUFFICIENCY
      Laura’s first point challenges the factual sufficiency of the evidence to support her
convictions. She does not challenge the State’s proof as to particular elements. See Purvis v.
State, 4 S.W.3d 118, 119-20 (Tex. App.—Waco 1999, no pet.). Rather, she contends without
elaboration that she “provided evidence contrary to the jury’s verdict.” The State asks us to
overrule the point because it is inadequately briefed. However, we will address the point in the
interest of justice. See Aldrich v. State, 928 S.W.2d 558, 559 n.1 (Tex. Crim. App. 1996);
Chimney v. State, 6 S.W.3d 681, 688 (Tex. App.—Waco 1999, pet. filed).
Standard of Review
      When presented with a factual insufficiency claim, we discard the prism of the light most
favorable to the verdict. See Johnson v. State, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000); Clewis
v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Perkins v. State, 19 S.W.3d 854, 856
(Tex. App.—Waco 2000, pet. ref’d). We “set[ ] aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.” Johnson, 23 S.W.3d
at 7 (quoting Clewis, 922 S.W.2d at 129). This occurs when “the proof of guilt is so obviously
weak as to undermine confidence in the jury’s determination, or the proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof.” Id. at 11; Perkins, 19 S.W.3d
at 856.
      We conduct “a neutral review of all the evidence, both for and against the [verdict].”
Johnson, 23 S.W.3d at 11; accord Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App.
1997). We review the evidence tending to prove the contested issue, “and compare[] it with the
evidence that tends to disprove that [issue].” Johnson, 23 S.W.3d at 7; accord Santellan, 939
S.W.2d at 164. We give appropriate deference to the jury's decision and do not substitute our
judgment for theirs. Johnson, 23 S.W.3d at 7; accord Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997). We do not “set aside a jury verdict merely because [we] feel that a different
result is more reasonable.” Clewis, 922 S.W.2d at 135 (quoting Pool v. Ford Motor Co., 715
S.W.2d 629, 634 (Tex. 1986)); accord Cain, 958 S.W.2d at 407.
      Section 261.109(a) provides, “A person commits an offense if the person has cause to believe
that a child's physical or mental health or welfare has been or may be adversely affected by abuse
or neglect and knowingly fails to report as provided in this chapter.” Tex. Fam. Code Ann. §
261.109(a). Thus, the elements for this offense are that: (1) the defendant; (2) had cause to
believe that a child had been or may be abused or neglected; and (3) knowingly failed to report
this abuse or neglect.



Application
      It does not appear that Laura is challenging the State’s evidence regarding the date of the
offenses, her identity, or her failure to make a report to CPS or any law enforcement agency. 
Instead, we construe her point as challenging the factual sufficiency of the evidence to prove that
she had cause to believe that C.W. had been abused on the five occasions in question. See Purvis,
4 S.W.3d at 119-20.
      The first count of the information alleges that Laura failed to report that C.W. had been
abused on or about November 15, 1996. Diane Brooks testified that she babysat C.W. on this date
and saw bruises on her bottom and legs. Because of her concerns, she photographed the bruises. 
She asked Laura about them a “couple of days later.” According to Brooks, Laura blamed C.W.’s
maternal grandmother for the bruises and told her that she had reported the situation to her
sergeant at the police department. The State offered the photographs in evidence, and they
confirm the bruising about which Brooks testified. 
      The girlfriend of Laura’s teenage son testified that she frequently visited the Whites’ home
during this time period. She testified that “[i]n the middle of November 1996” she saw “really
big” bruises on C.W.’s bottom. She reviewed the photographs taken by Brooks and confirmed
that they depict the bruises she saw on C.W. at that time. 
      Count two alleges that Laura failed to report that C.W. had been abused on or about August
31, 1997. Brooks testified that she noticed in August 1997 that C.W.’s ear was severly bruised. 
According to Brooks, C.W.’s “ear was black inside and outside and even down the neck. I mean,
it was bruised. It was—it was horrible.” When she asked Laura about the bruising, Laura told
her that C.W. had fallen against a coffee table.
      Robin Telesko also testified for the State. She began keeping C.W. in her home in August
1997.


 She testified that she saw bruising on C.W.’s bottom the first time Laura brought C.W.
to her house. Telesko immediately called Laura on her cellular phone and asked her to return and
look at the bruises. She told Laura that she was going to report the matter to CPS. According to
Telesko, Laura told her not to call CPS because she was working with her sergeant on the situation
and was attempting to obtain custody of C.W. from Eric. She told Telesko that she feared Eric
would flee with C.W. if CPS was called. Telesko also told Laura that she wanted to photograph
the bruising. Laura responded that that was unnecessary because she had already done so.
      The third count alleges that Laura failed to report that C.W. had been abused on or about
September 19, 1997. Mary Cannon, a “fairly close” acquaintance of Laura’s, testified that Laura
showed her “fresh bruises all over” C.W.’s bottom and legs when she visited Laura’s home
around that time. When Cannon asked C.W. who had done this to her, she said Eric had. Laura
confided in Cannon that “Eric was abusing [C.W].” Cannon encouraged Laura to photograph the
bruises, but she did not want to. According to Cannon, Laura assured her that she did not need
to call CPS because the neighbors were going to. Laura told Cannon that she would do so herself
if the neighbors did not. She admitted to Cannon that she would prefer not to call CPS, however,
because she was concerned about her relationship with Eric and about her job.
      Count four alleges that Laura failed to report that C.W. had been abused on or about October
15, 1997. Telesko testified that she observed bruises on C.W.’s neck in mid-October 1997. 
Cannon also recalled seeing these bruises. C.W. told Telesko that Laura had done this to her
when she “held her head in the toilet and told her this is where [she should vomit].”


 After
hearing this, Telesko called CPS. According to Telesko, CPS gave Laura a few days’ notice
before coming to investigate. The CPS investigation failed to substantiate the allegations.


 
Telesko later confronted Laura about the incident. Laura denied that what C.W. described had
ever occurred.
      The fifth count alleges that Laura failed to report that C.W. had been abused on or about
February 13, 1998. Telesko testified that Laura called and asked if she could babysit her children,
including C.W., on the night of February 14 while Laura and Eric went to dinner. According to
Telesko, Laura and Eric had never “completely” separated, and C.W. was still living with Laura. 
After Laura and Eric dropped off the children, C.W. told Telesko that her ears hurt. Telesko saw
bruises on the inside and outside of both ears. She also discovered bruises on her bottom.
      Telesko called the police, who responded and photographed the bruises. The State offered
these photographs in evidence, and Telesko confirmed that they depict the bruises she saw that
night. The investigators then went to Laura’s house to discuss their findings with the Whites. 
According to the CPS caseworker, the Whites denied any knowledge of these bruises. However,
Laura did volunteer that she had caused a bruise on the front of C.W.’s thigh several days earlier
when she had spanked C.W. with a wooden paddle for lying about a bathroom accident.
      Detective Renee Kamper testified that she informally interviewed Laura about the allegations. 
Laura confirmed to Kamper that she had told Telesko not to call CPS about the first incident
because she had already reported the matter to her sergeant. According to Kamper, Laura first
said that she had reported the matter to her sergeant, though she did not name the sergeant. After
Kamper repeatedly asked Laura to name the sergeant, Laura ultimately denied that she had ever
reported the matter to a sergeant. Laura also told Kamper that she had spoken to several friends
about the abuse but did not report it to the authorities because she was trying to save her marriage
and her job.
      Laura testified that Eric and she separated in May 1997. She and others testified that C.W.
remained primarily in Eric’s care after the separation. According to Laura, she had little contact
with C.W. after the separation. She testified that she was not with C.W. on the dates alleged in
the second, third and fourth counts of the information. Laura also called an acquaintance of Eric’s
who testified that Eric had “full custody” of C.W. after the separation and that she regularly
babysat C.W. between September and December of 1997. She never saw Laura with C.W. during
this time period.
      Laura testified that she never saw any of these bruises and that no one ever reported anything
like this to her. She accused the State’s witnesses of lying. She presented the testimony of another
witness who testified that she lived across the street from Laura and frequently babysat C.W. in
1996. This witness testified that she never saw any sign of bruises on C.W.
Summary
      The State’s witnesses testified that C.W. remained primarily in Laura’s care after the
separation. They further testified that, on the first four occurrences in question, they spoke
directly with Laura about their concerns that C.W. had been abused. On the last occasion,
Telesko testified that Laura called and asked her to babysit her children, including C.W. C.W.
told Telesko about the injuries to her ears after Laura and Eric left her and Laura’s other children
at Telesko’s for the evening.
      Laura countered this evidence with testimony that Eric had primary custody of C.W. after the
separation. She denied seeing any of the bruising about which the State’s witnesses testified and
further denied that any of the babysitters had ever called these bruises to her attention.
      After a neutral review of all the evidence, we conclude that the evidence favorable to the
verdict is not “so obviously weak as to undermine confidence in the jury’s determination.” See
Johnson, 23 S.W.3d at 11; Perkins, 19 S.W.3d at 858. We likewise conclude that the proof of
Laura’s guilt is not “greatly outweighed by contrary proof.” See Johnson, 23 S.W.3d at 11;
Perkins, 19 S.W.3d at 858. Therefore, the evidence is factually sufficient to support the jury’s
determination that Laura had cause to believe C.W. had been abused on the five occasions in
question. Accordingly, we overrule her first point.
VAGUENESS
      Laura argues in her third point that the court erred by denying her motion to dismiss because
section 261.109 is unconstitutionally vague as applied to her. She also suggests that the statute
implicates First Amendment rights because it “requires an ordinary citizen to espouse a particular
viewpoint regarding what constitutes child abuse or neglect.”
Pertinent Law
      In construing a statute, we begin with the presumption that it is constitutional. See Ex parte
Granviel, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978) (orig. proceeding); Webb v. State, 991
S.W.2d 408, 414 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d); Kaczmarek v. State, 986
S.W.2d 287, 292 (Tex. App.—Waco 1999, no pet.). We must uphold the statute if it can be
afforded a reasonable construction which renders it constitutional and effectuates legislative intent. 
See Ely v. State, 582 S.W.2d 416, 419 (Tex. Crim. App. [Panel Op.] 1979); Webb, 991 S.W.2d
at 414; McClain v. State, 984 S.W.2d 700, 703 (Tex. App.—Texarkana 1998, pet. ref’d); accord
Frisby v. Schultz, 487 U.S. 474, 483, 108 S. Ct. 2495, 2501, 101 L. Ed. 2d 420 (1988);
Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S. Ct. 2908, 2916, 37 L. Ed. 2d 830 (1973).
      Due process requires that a criminal statute give fair notice of that conduct which is criminally
prohibited. See Bynum v. State, 767 S.W.2d 769, 773 (Tex. Crim. App. 1989); Smith v. State,
959 S.W.2d 1, 24 (Tex. App.—Waco 1997, pet. ref’d); Morris v. State, 833 S.W.2d 624, 627
(Tex. App.—Houston [14th Dist.] 1992, pet. ref’d). To determine whether the challenged statute
provides fair notice (and thus is not unconstitutionally vague), we examine whether it: (1) “give[s]
the person of ordinary intelligence a reasonable opportunity to know what is prohibited;” and (2)
“provide[s] explicit standards for those who apply [it].” Bynum, 767 S.W.2d at 773 (quoting
Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298-99, 33 L. Ed. 2d 222
(1972)); accord Sanchez v. State, 995 S.W.2d 677, 689 (Tex. Crim. App.), cert. denied, 520 U.S.
1021, 120 S. Ct. 531, 145 L. Ed. 2d 411 (1999). Where no First Amendment rights are involved,
we need decide only whether the statute is impermissibly vague as applied to the defendant. See
Sanchez, 995 S.W.2d at 689; Bynum, 767 S.W.2d at 773-74; Smith, 959 S.W.2d at 24; Morris,
833 S.W.2d at 627; accord Maynard v. Cartwright, 486 U.S. 356, 361, 108 S. Ct. 1853, 1857-58,
100 L. Ed. 2d 372 (1988).
      However, if the statute “affect[s] communication protected by the First Amendment,” then
a defendant has standing in some cases to challenge the statute as vague on its face, even if it does
not affect her own First Amendment rights.


 Young v. American Mini Theatres, Inc., 427 U.S.
50, 59-60, 96 S. Ct. 2440, 2447, 49 L. Ed. 2d 310 (1976); accord Long v. State, 931 S.W.2d
285, 288 (Tex. Crim. App. 1996); Smith v. State, 772 S.W.2d 946, 950 (Tex. App.—Dallas 1989,
pet. ref’d); Al-Omari v. State, 673 S.W.2d 892, 896 (Tex. App.—Beaumont 1983, pet. ref’d). 
“The exception is justified by the overriding importance of maintaining a free and open market
for the interchange of ideas.” Young, 427 U.S. at 60, 96 S. Ct. at 2447; Al-Omari, 673 S.W.2d
at 896; accord Morehead v. State, 807 S.W.2d 577, 580 (Tex. Crim. App. 1991). 
      Nonetheless, this exception cannot be invoked if:
      •    the statute’s deterrent effect on legitimate expression is not “both real and substantial”;
and
 
      •    the statute is “readily subject to a narrowing construction by the state courts.”

Young, 427 U.S. at 60, 96 S. Ct. at 2447 (quoting Erznoznik v. City of Jacksonville, 422 U.S.
205, 216, 95 S. Ct. 2268, 2276, 45 L. Ed. 2d 125 (1975)); Al-Omari, 673 S.W.2d at 896. The
Supreme Court has reached this conclusion because “when considering a facial challenge it is
necessary to proceed with caution and restraint, as invalidation may result in unnecessary
interference with a state regulatory program.” Erznoznik, 422 U.S. at 216, 95 S. Ct. at 2276.
      A statute places a “real and substantial” burden on protected speech when “there [is] a
realistic danger that the statute itself will significantly compromise recognized First Amendment
protections of parties not before the Court.” Members of City Council v. Taxpayers for Vincent,
466 U.S. 789, 801, 104 S. Ct. 2118, 2126, 80 L. Ed. 2d 772 (1984).


 Even if the statute
substantially burdens these constitutional guarantees, we will not conclude that it is
unconstitutionally vague if we can narrowly construe it in such a manner “as to remove the
seeming threat or deterrence to constitutionally protected expression.” Broadrick, 413 U.S. at
613, 93 S. Ct. at 2916; accord Frisby, 487 U.S. at 483, 108 S. Ct. at 2501; Erznoznik, 422 U.S.
at 216, 95 S. Ct. at 2276; Long, 931 S.W.2d at 295. However, we “may not simply assume the
legislative prerogative and rewrite a statute in order to save it if the statute is not readily subject
to a narrowing construction.” Morehead, 807 S.W.2d at 581 (quoting Melville B. Nimmer,
Nimmer on Freedom of Speech: A Treatise on the First Amendment § 4.11[D], at 4-156
(1984)); accord Long, 931 S.W.2d at 295.
Analysis
      We initially address the First Amendment question to resolve the issue of whether Laura may
properly assert a facial vagueness challenge. See Young, 427 U.S. at 59-60, 96 S. Ct. at 2447;
Long, 931 S.W.2d at 288; Smith, 772 S.W.2d at 950; Al-Omari, 673 S.W.2d at 896; see also
Sanchez, 995 S.W.2d at 683. Laura contends that section 261.109 implicates First Amendment
rights because it “requires an ordinary citizen to espouse a particular viewpoint regarding what
constitutes child abuse or neglect.” The State responds that we ought not address the First
Amendment issue because White has inadequately briefed it.
      Rule of Appellate Procedure 38.9 requires that we liberally construe briefs. See Tex. R. App.
P. 38.9. Unless a brief “flagrantly violate[s]” the requirements of Rule 38, we will address
“every subsidiary question that is fairly included” in the issue or point under review. Id. 38.1(e),
38.9(a); see also Aldrich, 928 S.W.2d at 559 n.1; Chimney, 6 S.W.3d at 688. Although very little
of the argument in White’s third point discusses her First Amendment contention, we will address
the issue in the interest of justice. See Aldrich, 928 S.W.2d at 559 n.1; Chimney, 6 S.W.3d at
688.
      We first determine whether section 261.109 imposes a “real and substantial” burden on
protected speech. See Young, 427 U.S. at 60, 96 S. Ct. at 2447; Al-Omari, 673 S.W.2d at 896. 
The essence of White’s First Amendment argument is that the statute requires a person to report
suspected child abuse or neglect even if she disagrees with the statutory definition for these terms. 
See Tex. Fam. Code Ann. § 261.001(1), (4) (Vernon Supp. 2001) (defining the terms “abuse”
and “neglect”). 
      The United States Supreme Court has concluded that a statute impermissibly compels a
person’s speech in violation of the First Amendment when the statute requires him “to be an
instrument for fostering public adherence to an ideological point of view he finds unacceptable.” 
Wooley v. Maynard, 430 U.S. 705, 715, 97 S. Ct. 1428, 1435, 51 L. Ed. 2d 752 (1977); accord
Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 470-71, 117 S. Ct. 2130, 2139, 138
L. Ed. 2d 585 (1997); Wallace v. Jaffree, 472 U.S. 38, 51-52, 105 S. Ct. 2479, 2487, 86 L. Ed.
2d 29 (1985) (quoting Wooley). Although there are no Texas cases


 pertinent to this issue, the
Supreme Court of Minnesota has determined that its child abuse reporting statute does not compel
speech in violation of the First Amendment. See State v. Grover, 437 N.W.2d 60, 64 (Minn.
1989). That court held:
we find no merit to the argument that requiring compliance with the statute might
somehow interfere with the mandatory reporter's right of free speech by compelling him
to espouse a viewpoint with which he may not wish to be associated. The mandatory
reporting requirement of the child abuse statute compels no “expression” in the sense
reflected in Wooley v. Maynard, 430 U.S. 705, 715, 97 S. Ct. 1428, 1435, 51 L. Ed. 2d
752 (1977), in which it was held that the First Amendment prohibits laws that require an
individual “to be an instrument for fostering public adherence to an ideological point of
view he finds unacceptable.” The statute does not compel the dissemination of an
“ideological point of view,” but only mandates the reporting of information—a
requirement not altogether dissimilar from that imposed by the Internal Revenue Code. 
Moreover, a [person reporting suspected abuse] is free to include in a report that although
the report is mandated because the reporter has “reason to believe” that a child has been
abused, the reporter does not hold a personal belief that the child has been physically or
sexually abused. Cf. PruneYard Shopping Center v. Robins, 447 U.S. 74, 87, 100 S. Ct.
2035, 2044, 64 L. Ed. 2d 741 (1980).
 
Id.; see also Forest Hills Early Learning Ctr., Inc. v. Lukhard, 661 F. Supp. 300, 313-14 (E.D.
Va. 1987), rev’d on other grounds, 846 F.2d 260 (4th Cir. 1988) (child abuse reporting statute
does not “burden the churches’ free exercise of religion”).
      We agree with the reasoning of Grover. Because section 261.109 does not place a “real and
substantial” burden on protected speech, we conclude that Laura has standing to assert a vagueness
challenge to the statute only as it has been applied to her. See Young, 427 U.S. at 59-60, 96 S.
Ct. at 2447; Long, 931 S.W.2d at 288; Smith, 772 S.W.2d at 950; Al-Omari, 673 S.W.2d at 896.
      A statute will be found unconstitutionally vague as applied if it does not “give the person of
ordinary intelligence a reasonable opportunity to know what is prohibited.” See Bynum, 767
S.W.2d at 773; accord Sanchez, 995 S.W.2d at 689. Laura argues that section 261.109 fails this
part of the vagueness test because it applies to laypersons as well as professionals (unlike the
reporting statutes in other states) and because the statute’s requirements that a person report if she
“has cause to believe” that a child’s physical or mental welfare “has been or may be adversely
affected” are too indefinite.
      Laura cites an annotation in American Law Reports 4th for the proposition that “Texas is
among the minority of jurisdictions which criminalize a failure to report by any person.” See
Danny R. Veilleux, Annotation, Validity, Construction, and Application of State Statute Requiring
Doctor or Other Person to Report Child Abuse, 73 A.L.R. 4th 782 (1989).


 Even assuming this
is correct, the mere fact that Texas has adopted a universal reporting requirement does not render
section 261.109 vague.


 The test is whether the statute “give[s] the person of ordinary
intelligence [professional or layperson] a reasonable opportunity to know” when suspected abuse
must be reported. See Bynum, 767 S.W.2d at 773; accord Sanchez, 995 S.W.2d at 689.
      Section 261.109(a) criminalizes a person’s knowing failure to report if she “has cause to
believe that a child’s physical or mental health or welfare has been or may be adversely affected
by abuse or neglect.” Tex. Fam. Code Ann. § 261.109(a). Laura looks to similar statutes in
other states which require a person to report if she has reasonable cause to believe abuse has
occurred. See, e.g., Ga. Code Ann. § 19-7-5(c)(1) (Harrison 1995); Ky. Rev. Stat. Ann. §
620.030(1) (Michie 1999); Wis. Stat. Ann. § 48.981(2) (West Supp. 2000); see also Cal.
Penal Code § 11166(a) (West Supp. 2001) (requiring a report when a person “reasonably
suspects” abuse has occurred). She contends that this type of “reasonable cause” or “reasonable
suspicion” standard is the minimum necessary to provide fair notice of when a person has a duty
to report. We disagree.
      Webster’s defines “cause” in part as “sufficient reason.” Merriam-Webster’s Collegiate
Dictionary 182 (10th ed. 1993); see also Village of Hoffman Estates v. Flipside, Hoffman 
Estates, Inc., 455 U.S. 489, 501, 102 S. Ct. 1186, 1194-95, 71 L. Ed. 2d 362 (1982); Bynum,
767 S.W.2d at 774; Purnell v. State, 921 S.W.2d 432, 435 (Tex. App.—Houston [1st Dist.] 1996,
pet. ref’d) (each applying dictionary definitions to determine whether statute vague). We review
the evidence concerning the allegations of the information to see whether Laura had “sufficient
reason” to believe C.W. had been abused. 
      Laura is (or was) a certified peace officer and a licensed vocational nurse. Thus, she has
some specialized training and experience in recognizing when child abuse has occurred. In fact,
an internal affairs officer testified that Laura had received thirty-three hours “of child abuse
detection and recognition training” as an officer. Laura testified that she had called on CPS
“dozens of times” to assist in cases involving child abuse. The record reflects that Brooks and/or
Telesko called Laura’s attention to the bruises which form the basis for the first, second, and
fourth counts. Laura told them on each occasion that the matter had been reported to authorities. 
Laura herself showed Cannon the bruises relative to count three and assured her that CPS would
be notified. Regarding the last count, the record contains evidence that C.W. was in Laura’s care
at that time. Laura admitted to Kamper that she knew C.W. had been abused but did not report
it because she was trying to save her marriage and her job.
      For these reasons, we conclude that section 261.109, as applied in this case, gave Laura, a
certified peace officer, fair notice of that conduct which is criminally prohibited. See Morris, 833
S.W.2d at 627. We similarly hold that the statute as applied provides sufficiently explicit
standards to guide law enforcement officials. See Sanchez, 995 S.W.2d at 689; Bynum, 767
S.W.2d at 773. Accordingly, we overrule Laura’s third point.
WARRANTLESS SEIZURE
      Laura argues in her fifth point that the court abused its discretion by overruling her objection
to the State’s introduction in evidence of a photograph of a wooden paddle which officers took
from her home without a warrant. The State responds that Laura invited the officers to enter her
home on the occasion in question and that the paddle was in plain view.
      We review a court’s ruling on the admission of evidence under an abuse-of-discretion
standard. See Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); Kelley v. State,
22 S.W.3d 642, 644 (Tex. App.—Waco 2000, pet. ref’d). We will not reverse such a ruling so
long as it falls “within the ‘zone of reasonable disagreement.’” Green, 934 S.W.2d at 102
(quoting Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.1991) (op. on reh'g));
accord Kelley, 22 S.W.3d at 644.
      Lieutenant W.H. Mitchell and others went to Laura’s home after responding to Telesko’s call
on February 14, 1998 and observing the bruises on C.W.


 Lieutenant Mitchell was an
investigator in the internal affairs division of the Fort Worth Police Department. He explained
that he was summoned to conduct an administrative investigation because Laura and Eric were
officers with the department. Mitchell testified that Laura invited the officers into her house. She
had the officers wait in the living room while she went downstairs to awaken Eric. She returned
with him about fifteen minutes later.
      The officers asked Laura and Eric about C.W.’s injuries. Although they denied any
knowledge of C.W.’s then-existing injuries, Laura did admit that she had previously paddled C.W.
with the same paddle Eric and she used on her older children. After further discussion, Laura
went to another room with the CPS caseworker to share her suspicions about Eric. At that point,
another officer noticed a paddle lying on the couch and pointed it out to Lieutenant Mitchell. The
officers asked Eric if it was the paddle about which Laura had told them. He said that it was. The
officers seized the paddle as evidence.
      Laura asked the court to exclude a photograph of the paddle because the paddle had been
seized without a warrant and because Mitchell’s status as an internal affairs investigator rendered
any consent Laura allegedly gave him involuntary because of duress. The court overruled the
objection and later admitted the photograph in evidence before the jury.
      Laura testified later


 that she asked Mitchell if they could talk on her front porch to which
he responded, “No, he needed to come in.” According to Laura, Mitchell, another lieutenant, two
other officers, and the CPS caseworker all entered her home despite her request that they stay on
the porch. She testified that the paddle the officers found had been “stuffed down” in a magazine
rack in which she kept magazines and newspapers and was not in plain view.
      It would seem logical that we consider only Lieutenant Mitchell’s testimony in determining
whether the court abused its discretion in overruling Laura’s objection. However, the practice of
the Court of Criminal Appeals has been to consider subsequently-offered testimony relevant to this
type of issue to avoid “plac[ing] the appellate court in the untenable position of having to reverse
a conviction in the face of a record which supports, albeit belatedly, the trial court’s ruling.” 
Webb v. State, 760 S.W.2d 263, 272 n.13 (Tex. Crim. App. 1988); accord Rachal v. State, 917
S.W.2d 799, 809 (Tex. Crim. App. 1996); Barley v. State, 906 S.W.2d 27, 31 n.2 (Tex. Crim.
App. 1995); In re A.D.D., 974 S.W.2d 299, 305 (Tex. App.—San Antonio 1998, no pet.). 
Accordingly, we consider both Mitchell’s and Laura’s testimony in deciding the issue presented.
      The issue of whether Laura voluntarily consented to the officers’ entry into her home is a fact
question to be determined from the totality of the circumstances. See Carmouche v. State, 10
S.W.3d 323, 331 (Tex. Crim. App. 2000) (citing Ohio v. Robinette, 519 U.S. 33, 40, 117 S. Ct.
417, 421, 136 L. Ed. 2d 347 (1996)); White v. State, 21 S.W.3d 642, 645 (Tex. App.—Waco
2000, pet. ref’d). Under article I, section 9 of the Texas Constitution, the State bears the burden
of proving by clear and convincing evidence that Laura voluntarily consented to the officers’
entry. See State v. Ibarra, 953 S.W.2d 242, 245 (Tex. Crim. App. 1997); accord Carmouche,
10 S.W.3d at 331; White, 21 S.W.3d at 645-46. “For the consent to be voluntary, it must not be
the product of duress or coercion, actual or implied.” White, 21 S.W.3d at 645 (citing
Carmouche, 10 S.W.3d at 331).
      In addition to the consent question, Laura’s fifth point concerns the “plain view” exception
to the warrant requirement. Under this recognized principle, an officer may lawfully seize
evidence without a warrant if: (1) he observes evidence in plain view from a location where he has
a right to be; and (2) the incriminating nature of the evidence is “immediately apparent.” See
Horton v. California, 496 U.S. 128, 136, 110 S. Ct. 2301, 2308, 110 L. Ed. 2d 112 (1990) (citing
Coolidge v. New Hampshire, 403 U.S. 443, 466, 91 S. Ct. 2022, 2038, 29 L. Ed. 2d 564 (1971));
see also Martinez v. State, 17 S.W.3d 677, 685 (Tex. Crim. App. 2000).
      We review the court’s resolution of these issues under the standard articulated in Guzman v.
State. 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); accord Carmouche, 10 S.W.3d at 327; White,
21 S.W.3d at 645. We give “almost total deference to [the] court’s determination of the historical
facts,” particularly when the court’s determination depends on an evaluation of the credibility and
demeanor of the witnesses who testify to those facts. Guzman, 955 S.W.2d at 89; accord
Carmouche, 10 S.W.3d at 327; White, 21 S.W.3d at 645.
      Lieutenant Mitchell testified that Laura invited the officers to enter her home and that the
paddle lay in plain view. Laura denied that she consented to the officers’ entry or that the paddle
lay in plain view. Although she acknowledged in her testimony that Mitchell was an internal
affairs investigator, she did not testify that she felt any duress or coercion because of his status,
at least not regarding the officers’ entry into her home.


 
      The resolution of these issues revolves almost totally around the court’s evaluation of the
credibility and demeanor of these two witnesses. Accordingly, we give great deference to the
court’s resolution of these issues. See id. Because the record supports the court’s determination
that Laura consented to the officers’ entry in her home and that the paddle lay in plain view, we
conclude that the court did not abuse its discretion by admitting a photograph of the paddle in
evidence. See Green, 934 S.W.2d at 101-02; Kelley, 22 S.W.3d at 644. Thus, we overrule
Laura’s fifth point.
LIMITATIONS INSTRUCTION
      Laura contends in her second point that the court erred by denying her requested instruction
to the jury regarding the applicability of the statute of limitations to the first count of the
information.


 The State responds that the court adequately charged the jury on this issue.
      If a defendant raises the statute of limitations as a defense, “then the State must prove beyond
a reasonable doubt that the prosecution is not limitations-barred.” Proctor v. State, 967 S.W.2d
840, 844 (Tex. Crim. App. 1998).


 A two-year statute of limitations applies to misdemeanor
offenses. See Tex. Code Crim. Proc. Ann. art. 12.02 (Vernon 1977). The date of the offense
and the date the indictment or information is presented are not included in the computation. Id.
art. 12.04 (Vernon 1977).
      Article 12.05 of the Code of Criminal Procedure provides for a tolling of the statute of
limitations “during the pendency of an indictment, information, or complaint.” Tex. Code Crim.
Proc. Ann. art. 12.05(b), (c) (Vernon 1977). Thus, article 12.05 operates as a constraint on the
limitations defense. Cf. Smith v. State, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998) (provoking
the difficulty “acts as a limitation or total bar on a defendant’s right to self-defense”). Before the
court can charge the jury on the tolling provisions of article 12.05, the record must contain
“sufficient evidence” that a former indictment, information or complaint was pending in a court
of competent jurisdiction for a sufficient length of time as to make the present charging instrument
timely. Id. at 513 (setting forth requirements for a provocation charge); see also Tex. Code
Crim. Proc. Ann. art. 12.05(b), (c).
      The offense stated in the first count of the information allegedly occurred “on or about
November 15, 1996.” The parties appear to accept November 15 as the date of this offense. We
shall do likewise. Thus, the State had to present an indictment or information against Laura no
later than November 16, 1998 to satisfy the limitations statute. See Rendon v. State, 695 S.W.2d
1, 5 (Tex. App.—Corpus Christi 1984, pet. ref’d).
      The grand jury presented an indictment against Laura on August 20, 1998, before limitations
ran. The indictment was filed in the County Criminal Court No. 10, a court with jurisdiction over
the offense alleged.


 See Tex. Gov. Code Ann. § 25.2223(a) (Vernon Supp. 2001). The State
filed the information against Laura on March 10, 1999. The indictment remained pending when
the State filed the information. The trial court took judicial notice of these facts.


 See Tex. R.
Evid. 201(g).
      The court charged the jury as follows on the issue of limitations:
You are further charged as the law in this case that the State is not required to prove
the exact date alleged in the information, but may prove the offense, if any, to have been
committed at any time prior to the filing of the information so long as said offense, if
any, occurred within two years of the date of the filing of the information.
 
In determining whether the information in this case was filed within two years of the
date of the offense, if any, you shall not compute any time during the pendency of an
indictment or information toward the two year limit.
 
The Court has taken judicial notice that on August 20, 1998 an indictment was filed
in this court charging the defendant Laura I White, with the offense of failure to report
child abuse, and said indictment was pending on March 10, 1999, the date that this
information was filed.
 
You are further instructed that the jury may, but is not required to, accept as
conclusive any fact judicially noticed.

      The court further charged the jury in the application paragraph relative to count one that, in
order to convict Laura of the offense alleged in the first count, the jury had to find beyond a
reasonable doubt that she committed the offense alleged and had to:
further find that on the 20th day of August, 1998, an information or indictment was filed
in this court charging said defendant with the above charged offense and thereafter on the
10th day of March, 1999, the said information or indictment was pending in said court
at the time this information was filed . . . .

Laura requested an instruction which did not reference the August 1998 indictment and had no
language regarding the tolling provisions of article 12.05.
      The essence of Laura’s argument is that the indictment did not toll the limitations period. 
However, she provides no reasoning to support this argument. When the time period during
which the August 1998 indictment was pending is excluded from the period between the date of
the offense and the date the March 1999 information was filed, the allegation of count one of the
information is not limitations-barred. See Tex. Code Crim. Proc. Ann. art. 12.05(b), (c). 
Because of this, the court properly instructed the jury on the tolling effect of the indictment and
properly denied Laura’s requested instruction. Accordingly, we overrule her second point.
      We affirm the judgment.
 
                                                                   REX D. DAVIS
                                                                   Chief Justice

Before Chief Justice Davis
            Justice Vance and
            Justice Gray
            (Justice Gray concurring)
Affirmed
Opinion delivered and filed June 6, 2001
Publish